CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 0 6 2010

JULIA C. DUDLEY, CLERK
BY: /s/
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> ALLIANCE ONE TOBACCO ) <br> OSH, LLC, ) <br> ) <br> Defendant ) <br> ) | Criminal No. 4:10CR00016 |
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> ALLIANCE ONE ) <br> INTERNATIONAL AG, ) <br> ) <br> Defendant ) <br> ) | Criminal No. 4:10CR00017 |

## GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, the United States Department of Justice, Criminal Division, Fraud Section ("the Department"), respectfully submits this Consolidated Sentencing Memorandum, for the Court's consideration in resolving the corporate pleas of guilty in the two cases captioned above. For the reasons set forth below, the United States respectfully requests the Court to accept the guilty pleas of ALLIANCE ONE TOBACCO OSH, LLC, and ALLIANCE ONE INTERNATIONAL AG, pursuant to Rule 11(c)(1)(C), Fed. R. Crim. P., to consolidate

the entry of the plea of guilty and the sentencing into one proceeding, and to sentence them in accordance with the terms of the Plea Agreement filed simultaneously herewith.

## I. INTRODUCTION

### A. The Foreign Corrupt Practices Act

The Foreign Corrupt Practices Act of 1977 (hereinafter, the "FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, prohibits certain classes of persons and entities from making payments to foreign government officials to obtain or retain business. Specifically, Title 15, United States Code, Section 78dd-3(a)(1), prohibits any person, other than an issuer or a domestic concern, while in the territory of the United States, from corruptly making use of the mails or any means or instrumentality of interstate commerce or doing any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money or anything of value to any foreign official for the purpose of obtaining or retaining business for, or directing business to, any person. Furthermore, Title 15, United States Code, Sections 78m(b)(2)(A) and (b)(5), required issuers to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflected transactions and dispositions of the company's assets and prohibited the knowing falsification of such books, records or accounts.

In each case presently before the Court, there is a three-count criminal Information charging the corporation with (a) conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the

FCPA (15 U.S.C. § 78dd-3) and to falsify books and records of the company in violation of the FCPA (15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a)); (b) violating the anti-bribery provisions of the FCPA (15 U.S.C. § 78dd-3(a)); and (c) falsification of corporate books and records, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), 78ff(a) and Title 18, United States Code, Section 2. The defendant corporations have agreed to enter pleas of guilty to the Informations.

### B. The Corporations

Alliance One International, Inc. ("Alliance"), is an independent leaf tobacco merchant that purchases, processes and sells tobacco to manufacturers of consumer tobacco products worldwide. Alliance is a publicly traded Virginia corporation which maintains its principal place of business in Morrisville, North Carolina. The company was formed in 2005 as the result of a merger of DIMON Incorporated ("Dimon") and Standard Commercial Corporation ("Standard"), both of which were wholesale leaf tobacco merchants. Before the merger, Dimon was headquartered in Danville, Virginia, in the Western District of Virginia.

Beginning in 1994, Dimon purchased tobacco from growers in the Republic of Kyrgyzstan through a wholly owned subsidiary, Dimon International Kyrgyzstan ("DIK"), a Kyrgyzstan corporation. DIK purchased, processed and sold Kyrgyz tobacco to Dimon's customers throughout the world. After the merger, DIK was renamed

ALLIANCE ONE TOBACCO OSH, LLC ("AOI-Kyrgyzstan"), one of the present defendant corporations.[1]

Beginning in 2000, Dimon sold Brazilian-grown tobacco to the Thailand Tobacco Monopoly ("TTM") through another wholly owned subsidiary, Dimon International AG ("DIAG"), a Swiss corporation. Beginning in 2001, Standard also sold Brazilian-grown tobacco to the TTM through its wholly owned subsidiary, Standard Brazil, Ltd. ("Standard Brazil"). After the merger, Standard Brazil was folded into DIAG to form one subsidiary corporation named ALLIANCE ONE INTERNATIONAL AG ("AOIAG"), a Swiss corporation, another of the present defendant corporations.

### C. Summary of the FCPA Violations

The criminal offenses charged in these cases were committed primarily through foreign subsidiaries of Dimon and Standard before the 2005 merger of those two corporations to form Alliance.[2] After the merger, Alliance re-aligned and re-named some of its foreign subsidiaries. The two corporations named in the proposed plea agreements are legally responsible for the acts of their corporate predecessors, which operated under different names before the merger.

---

[1] Osh is a city in Kyrgyzstan where DIK maintained its headquarters.

[2] The corporations have executed a tolling agreement that provides that the statute of limitations was tolled on May 24, 2004, the date on which the corporation first notified the Department that they were undertaking an internal investigation. The tolling period will end one year after notice of termination by the corporation.

The Information charges AOI-Kyrgyzstan with violations of the FCPA based upon corrupt payments made by employees of DIK to various foreign officials in Kyrgyzstan. The corrupt payments were made to (a) officials of the Kyrgyz Tamekisi, a government entity that controlled and regulated the tobacco industry in Kyrgyzstan; (b) local provincial government officials known as "Akims;" and (c) the Kyrgyz Tax Police. AOI-Kyrgyzstan is legally responsible for the criminal acts of its predecessor corporation, DIK.

The Information charges AOIAG with violations of the FCPA based upon corrupt payments made by DIAG and Standard Brazil to foreign officials in Thailand. DIAG, Standard Brazil and a third U.S. tobacco company (referred to herein as "Company A") sold Brazilian tobacco to the TTM. Each of the three companies retained sales agents in Thailand, and collaborated through those agents to apportion tobacco sales to the TTM among themselves, coordinate their sales prices and pay kickbacks to officials of the TTM in order to ensure that each company would share in the Thai tobacco market. From 2000 to 2003, DIAG made four annual sales to the TTM and, from 2001 to 2004, Standard Brazil made four annual sales to the TTM. The kickbacks were paid by each company at approximately the same rate based upon the number of kilograms of tobacco sold to the TTM from each annual Brazilian tobacco crop. AOIAG is legally responsible for the criminal acts of its two predecessor corporations.

Although the criminal conduct in these cases occurred prior to the 2005 merger, Alliance is legally responsible for the conduct of its corporate predecessors and their subsidiaries. The United States and Alliance, however, have entered into a Non-Prosecution Agreement ("NPA") simultaneously with the entry of the guilty pleas by the subsidiary corporations described above. The NPA requires the corporation to stipulate to a statement of facts and to continue its complete cooperation with the government for a term of three years. Further, the NPA requires Alliance to strengthen its internal controls, implement a rigorous compliance program and engage an independent corporate monitor ("monitor") who will conduct a comprehensive review of the Company's compliance standards and procedures and its internal controls. The Monitor will prepare an initial report and two follow-up reports of his or her findings and make recommendations for improvements in the Company's compliance program over the three-year term.

## II.  FACTUAL SUMMARY

The government's investigation began with a self-disclosure by counsel for Dimon in 2004.[3] Company auditors identified a company bank account at the Demir Kyrgyz International Bank that had been maintained in the names of employees of DIK, that they called the "special account." The DIK Country Manager in Kyrgyzstan ("DIK Employee

---

[3] The Department encourages companies to disclose evidence of potential FCPA violations promptly. The agreed dispositions in this case partly reflect credit given for Alliance's timely self-disclosure, thorough investigation and ongoing cooperation.

A") was a U.S. citizen living in Kyrgyzstan whose name was on the "special account."[4] Because of the relatively undeveloped economy in Kyrgyzstan, DIK paid cash for many business expenses with funds from this account, including some salaries, but the auditors suspicions were aroused because it was maintained in the name of employees, not the company itself. The account was funded by wire transfers from another Dimon subsidiary operating in the U.K., based upon requests for additional funding from DIK Employee A and others at DIK.

### A.   Kyrgyzstan

In 1996, the Kyrgyzstan government imposed a requirement that all exporters of fermented tobacco must have an export license. The Kyrgyztamekisi ("Tamekisi") was a government-owned Joint Stock Company that controlled the issuance of export licenses, thus effectively controlling all tobacco purchases in Kyrgyzstan. The Director General of the Tamekisi ("Kyrgyz Official A"), had the authority to sign export licenses. As the director of an agency or instrumentality of the government, Kyrgyz Official A was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A). Kyrgyz Official A informed DIK Employee A that the export licensing requirement would result in greater competition for DIK from other companies and that "Tamekisi will share in any profit [Dimon] makes." Under Presidential Order, the

---

[4] DIK Employee A has agreed to enter a plea of guilty which is scheduled in the Western District of Virginia on August 3, 2010.

Tamekisi was also responsible for overseeing the fermentation of tobacco and operated state-controlled tobacco fermentation plants throughout Kyrgyzstan. No private fermentation plants could operate legally in Kyrgyzstan.

### 1. Bribes paid to the Tamekisi

In October 1996, a senior executive involved in Dimon's European operations and Kyrgyz Official A signed a written agreement that provided that the Tamekisi would issue a license to DIK to process and export tobacco from the 1996 crop. Further, DIK agreed to pay the Tamekisi $0.18 per kilogram for future tobacco processing services plus an additional $0.05 per kilogram for "financial assistance."

The payments for "financial assistance" were actually bribes paid to Kyrgyz Official A in violation of the FCPA. DIK Employee A periodically withdrew cash and delivered bags filled with $100 bills to Kyrgyz Official A at the Tamekisi's office in Bishkek, Kyrgyzstan. From 1996 to 2004, DIK Employee A paid more than $2.6 million to Kyrgyz Official A on behalf of DIK from the special account.

### 2. Bribes paid to the Akims

In Kyrgyzstan, each municipal or provincial governmental unit was headed by a public official known as an "Akim," who was appointed to the post by the President of Kyrgyzstan on the advice of the Prime Minister.[5] DIK needed the support and consent

---

[5] Accordingly, the Akims were "foreign officials" within the meaning of the FCPA, 15 U.S.C. § 78dd-3(f)(2)(A).

from each local Akim in order to purchase tobacco from local growers or agricultural collectives. The Akims had the power and influence to prevent the purchase of tobacco in the region, even if a company had an export license. Akims could also send the police to block the entrance to buying stations and take other action to prevent the transfer of tobacco. Akims were paid approximately $0.01 per kilogram of tobacco purchased by DIK from growers in each province. From 1996 to 2004, DIK Employee A authorized and paid bribes totaling $283,762 to five Akims on behalf of DIK.

### 3. Bribes paid to the Kyrgyz Tax Police

During periodic audits of DIK's business affairs in Kyrgyzstan, the Kyrgyz Tax Inspection Police assessed penalties and threatened to shut down DIK.[6] The tax inspections generally lasted about seven weeks and DIK personnel devoted most of their work hours to responding to queries from the tax officials. Upon completion of one audit, the Kyrgyz tax officials would begin performing yet another inspection. During one audit, the tax officials determined that DIK failed to submit two reports to the tax office. As a result, the tax officials imposed a fine of 2.2 million Kyrgyz soms (about $171,741) against DIK. The tax authorities also threatened to seize DIK's bank accounts and tobacco inventory for tax violations. The tax authorities later offered to reduce the tax penalties levied against DIK in exchange for cash payments. At that point, DIK

---

[6] The Kyrgyz Tax Inspection Police were "foreign officials" within the meaning of the FCPA, 15 U.S.C. § 78dd-3(f)(2)(A),

Employee A made a cash payment to the tax authorities from the special account. From 1996 through 2004, DIK Employee A paid approximately $82,850 to Kyrgyz tax officials on behalf of DIK.

### 4. False Books and Records

DIK falsified its books, records, and accounts, and inaccurately reflected the cash payments to the Tamekisi, the Akims and the Kyrgyz Tax Inspection Police totaling $3,050,672 as, among other things, "financial assistance" or "commissions," when in fact these payments were bribes, all or part of which DIK understood and intended would be transferred to Kyrgyz government officials.

### B. Thailand

In or about 1943, the Government of Thailand established the Thailand Tobacco Monopoly ("TTM"), an agency and instrumentality of the government, to manage and control the government-owned tobacco industry in Thailand. The TTM supervised the cultivation of domestic tobacco crops, purchased imported tobacco and manufactured cigarettes and other tobacco products in Thailand. The TTM was headed by a Managing Director, appointed by the Finance Ministry, who reported through a Board of Directors directly to the Minister of Finance of Thailand.[7] Dimon purchased tobacco from growers in Brazil and sold the Brazilian tobacco to the TTM through its Swiss subsidiary DIAG.

---

[7] The Managing Director is referred to as "Thai Official A" in the Information and was a "foreign official" within the meaning of the FCPA, 15 U.S.C. § 78dd-3(f)(2)(A).

Standard sold Brazilian tobacco to the TTM through its Channel Islands subsidiary, Standard Brazil.

### 1. Bribes paid to the TTM

From 2000 through 2004, Dimon, Standard and Company A, through their agents, subsidiaries and affiliates, collaborated together to apportion tobacco sales to the TTM among themselves and to coordinate their sales prices in order to ensure that each company would share in the Thai tobacco market. The three companies also agreed to pay "special expenses" to the TTM, calculated at an agreed rate per kilogram of tobacco sold to the TTM; sometimes disguised as part of the "commissions" paid to their sales agents. The "special expenses" were, in fact, paid as kickbacks to TTM officials to induce the TTM to purchase tobacco and to secure an improper advantage for Dimon, Standard and Company A. Over a period of four years, the three companies made a single annual sale of tobacco to the TTM corresponding with each annual tobacco crop in Brazil.

From 2000 through 2003, DIAG paid "special expenses" totaling approximately $542,950 as kickbacks to TTM officials in connection with its four annual sales of Brazilian tobacco to the TTM. Dimon realized net profits of approximately $4.3 million from those sales.

From 2001 through 2004, Standard Brazil paid "special expenses" totaling approximately $696,160 as kickbacks to TTM officials in connection with its four annual

sales of Brazilian tobacco to the TTM. Standard realized net profits of approximately $2.7 million from those sales.

### 2. False Books and Records

DIAG and Standard Brazil (on behalf of Dimon and Standard) failed to account properly for the corrupt "special expenses" paid as kickbacks to the TTM officials, and falsely described those transactions in their books and records. DIAG falsely described the corrupt payments as legitimate payments of "commissions."

## III. SENTENCING GUIDELINES ANALYSIS

The Sentencing Guidelines analysis is the same in both cases and results in a Guidelines fine range of $4,200,000 – $8,400,000. In the Plea Agreements, the parties stipulate that the following Guidelines calculation, using the 2003 edition of the Sentencing Guidelines Manual, is the proper application of the Sentencing Guidelines to the criminal charges alleged in each Information:

### A. Calculation of Offense Level :

- Base Offense Level (U.S.S.G. § 2C1.1(a)):     *10*
- More than one bribe (U.S.S.G. § 2C1.1(b)(1)):     + 2
- Benefit received or to be received of approximately
  $7 million (U.S.S.G. §§ 2C1.1(b)(2)(A), 2B1.1(b)(1)(J)):   *+ 18*

**TOTAL OFFENSE LEVEL:**     *30*

**B.    Calculation of Culpability Score:**

- Base Score (U.S.S.G. § 8C2.5(a)):                                                      5

- Involvement in or tolerance of criminal activity in an organization of 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense (U.S.S.G. § 8C2.5(b)(4)):      +   2

- Self-reporting, cooperation, acceptance of responsibility (U.S.S.G. § 8C2.5(g)(1)):      -   5

**TOTAL CULPABILITY SCORE:**                                                      2

**C.    Calculation of Fine Range:**

- Base Fine: Greater of the amount from table in U.S.S.G. § 8C2.4(a)(1) & (d) corresponding to offense level of 30 ($10,500,000), or the pecuniary gain to the organization from the offense ($4.8 million or $7 million)[8] (U.S.S.G. § 8C2.4(a)(2)):      *$10,500,000*

- Multipliers, culpability score of 2 (U.S.S.G. § 8C2.6):   0.40 - 0.80

- Fine Range (U.S.S.G. § 8C2.7):      ***$4,200,000 – $8,400,000***

## IV.    THE PLEA AGREEMENTS

The Plea Agreements in these cases are presented to the Court pursuant to Rule 11(c)(1)(C), Fed. R. Crim. P. The parties understand that the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.

---

[8] During the relevant time, AOI-Kyrgyzstan realized net profits of $4.8 million and AOIAG realized net profits of $7 million, neither of which is greater than the $10,500,000 threshold set forth in U.S.S.G. § 8C2.4(a)(2).

13

*United States v. Booker*, 543 U.S. 220 (2005). The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The Department and the defendant corporations understand and agree that if the Court accepts these Agreements, the Court is bound by the sentences as negotiated by the parties and set forth in paragraphs 17 - 21 of the Agreements. On the other hand, if the Court does not accept the agreement as to sentence, the defendants are entitled to withdraw their pleas of guilty.

### A.    The Negotiated Penalties

As noted above, the applicable Guidelines range in these cases is a fine of $4,200,000 to $8,400,000. In both cases, the Department and the defendant corporations have negotiated a fine that is at or above the minimum fine in the range. There is no downward departure from the applicable Guidelines range in these cases.

Defendant ALLIANCE ONE TOBACCO OSH, LLC has agreed to pay a fine of $4,200,000. The Department submits that a fine at the low end of the Guidelines range is appropriate in this case given the company's prompt and timely self-disclosure of the potentially corrupt payments as soon as they were discovered, the remedial measures taken and the nature and extent of the company's cooperation throughout the government's investigation. The company retained outside counsel to conduct an extensive internal investigation and voluntarily produced thousands of pages of documents and memoranda of witness interviews. The company's remedial measures,

outlined below, included the termination of all employees found to have authorized or participated in the improper payments.

Defendant ALLIANCE ONE INTERNATIONAL AG has agreed to pay a fine of $5,250,000. This fine is above the minimum of the range partly to account for the fact that two subsidiaries (DIAG and Standard Brazil) participated in the commission of the offense, along with a third unrelated company, although they were subsidiaries of different parent corporations at the time. Further, because DIAG, Standard Brazil and Company A collaborated to fix prices and pay bribes to the Thai officials, the conduct was not limited to a few employees or confined to a single business unit.

### B. Alliance's Cooperation and Remedial Measures

Alliance's cooperation was both timely and thorough. During the course of the government's investigation, Alliance and its outside counsel fully cooperated in good faith with the Department, and produced thousands of pages of documents and financial records. Alliance terminated or sought resignations from all employees who were found to have knowledge of or participated in the improper payments. Alliance voluntarily produced memoranda of employee interviews conducted by counsel. Alliance and their counsel have been available to meet with Department attorneys to brief them on the progress and findings of their internal investigation. The agreed dispositions, described above, reflect the Department's recognition of Alliance's timely and thorough cooperation.

Alliance took remedial actions including enhancement of its corporate compliance program, replacement of responsible management, and discipline or termination of wrongdoers. Specifically, Alliance took the following remedial actions:

- The Special Account maintained in the name of employees was closed.

- On May 24, 2004, the Audit Committee directed management to deliver a "clear and proactive message" that:
  - "Illegal acts will not be tolerated in Dimon;"
  - "any potentially illegal act should be brought to the attention of the CLO prior to execution of the transaction;" and
  - "any individual that believes that an illegal act may have occurred should contact the CLO immediately."

- Management issued a directive to regional executives and all accounting personnel that any questionable expenses or payments and expenses without adequate explanation or documentation must be reported to the Corporate Compliance Officer.

- The Audit Committee implemented a new policy requiring CFO or Controller pre-approval of any material payment in cash.

- Management issued a direction to employees that "[n]o payments to public officials or political parties are to be made in any form without the express advance approval of the Corporate Compliance Officer."

- Compliance Officer required all personnel to re-take an online training course coverning the FCPA provided by Integrity Interactive.

- Responsible personnel, including senior management in Europe and Kyrgyzstan were terminated or left company voluntarily. Other employees were reprimanded.

- Corporate Accounting required supporting information for all payments made in cash from any entity where such payments exceed $2500 annually, and issued a directive to minimize cash payments for anything other than incidental expenses.

- All cash accounts must be maintained in the company's name.

- All cash transactions are required to be documented by receipts and signed by the recipient and they established a periodic review and approval process for all

non-incidental types of expenses paid in cash to ensure payments would comply with Company policy and the law.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court accept the guilty pleas to be entered by defendant corporations, ALLIANCE ONE TOBACCO OSH, LLC and ALLIANCE ONE INTERNATIONAL AG, and approve the disposition of these matters, pursuant to Rule 11(c)(1)(C), Fed. R. Crim. P., as described in this memorandum, and impose sentence according to the terms of the Plea Agreements.

Respectfully submitted,

DENIS J. McINERNEY, CHIEF
Fraud Section, Criminal Division
United States Department of Justice

By: _____
JOHN A. MICHELICH
Senior Trial Attorney, Fraud Section
United States Department of Justice
Fraud Section, Criminal Division
10th & Constitution Avenue, NW
Washington, D.C. 20530
(202) 514-7023

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2010, I sent the foregoing GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM by electronic mail to the following counsel:

EDWARD J. FUHR, ESQ.  efuhr@hunton.com
MATTHEW P. BOSHER, ESQ.  mbosher@hunton.com
   Hunton & Williams LLP
   Riverfront Plaza, East Tower
   951 East Byrd Street
   Richmond, Virginia 23219
Counsel for defendants ALLIANCE ONE TOBACCO OSH, LLC and ALLIANCE ONE INTERNATIONAL AG

COLLEEN P. MAHONEY, ESQ.  colleen.mahoney@skadden.com
   1440 New York Ave., N.W.
   Washington, D.C. 20005
KEITH D. KRAKAUR, ESQ.  keith.krakaur@skadden.com
   Four Times Square
   New York, NY 10036
Counsel for the Board of Directors, Audit Committee, ALLIANCE ONE INTERNATIONAL, INC.

*/s/ John A. Michelich*
John A. Michelich
Senior Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
10th & Constitution Ave., N.W.
Bond Building, Fourth Floor
Washington, D.C. 20530
(202) 514-0931